## ATLANTIC COAST LINE R. CO. v. COMMISSIONER OF INTERNAL REVENUE.*

### CAROLINA, C. & O. RY. v. SAME.

#### Nos. 3895, 3896.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1936.

PARKER, Circuit Judge, dissenting in part.

———◆———

Nathan L. Miller, of New York City (Carl H. Davis, of Wilmington, N. C., Edward C. Bailly, of New York City, and Robert R. Faulkner, of Washington, D. C., on the brief), for petitioners.

Morton K. Rothschild, Sp. Asst. to the Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

*Certiorari denied 56 S. Ct. 676, 80 L. Ed. ——.

SOPER, Circuit Judge.

Two questions are presented by the petition for review in these cases: (1) Whether either the lessor or the lessee is entitled to a deduction for depreciation under section 23 (k) of the Revenue Act of 1928, 45 Stat. 791, 799, when one railroad company leases equipment from another for 999 years and agrees to maintain, repair, and renew the property during the term of the lease; and (2) whether a railroad company which acquires the common stock of another in exchange for a stated consideration, including a guaranty to pay dividends on the other's preferred stock, and makes payments under its guaranty, is entitled to deduct the amounts paid as ordinary and necessary expenses or losses under section 23 (a) and (f) of the Revenue Act of 1928. Income taxes for the years 1928, 1929, and 1930 are involved.

Under a lease of October 16, 1924, the Carolina, Clinchfield & Ohio Railway, hereinafter called the Carolina Company, and its subsidiaries, leased all their properties to the Atlantic Coast Line Railroad Company, hereinafter called the Coast Line, and the Louisville & Nashville Railroad Company, jointly, for a period of 999 years. The Coast Line owns 51 per cent. of the stock of the Louisville & Nashville. The lease provided for the payment by the lessees of money rental in stated amounts, certain corporate expenses of the lessors, interest on outstanding obligations of the lessors, and all taxes upon the lessors or the leased property, including federal income taxes. In addition thereto, the lessees agreed at their own expense to maintain, repair, renew, and replace the leased property so that the same should at all times be in substantial repair, working order, and condition, but with the right in their discretion to replace with other property of equal value; to make such additions and betterments as in their judgment should be advisable at their own expense and accept the bonds or other obligations of the lessors therefor; during the term of the lease, to assume all liability of the lessors in respect to maturing obligations as set out in the lease, with the right only to receive new bonds of the lessors payable in effect at the end of the lease and without interest; during the term of the lease to abide by, keep, and perform all agreements and covenants binding on the lessors under any of their mortgages, deeds of trust, and equipment trust agreements; and to return the leased property at the

end of the term or upon earlier termination of the lease in good order and condition, ordinary wear and tear excepted.

Since the effective date of the lease, the accounts of all the railroad companies involved have been kept in accordance with the uniform system of accounts prescribed by the Interstate Commerce Commission pursuant to the authority vested in it by the Interstate Commerce Act. In accordance with this system, no charge has been made on the books of the lessors on account of depreciation computed on the leased equipment, but depreciation has been computed thereon and currently accrued on the books of the lessees.

■ The taxpayers concede that their tax liability is not controlled by the system of accounts established in accordance with the rules and regulations of the Interstate Commerce Commission; but the Coast Line, one of the taxpayers, seeks to deduct from its gross income an allowance for depreciation with respect to the property in which it had no capital investment, but which it held under the lease for 999 years. The Carolina Company, the other taxpayer, seeks in the alternative to deduct from its gross income an allowance for said depreciation on the same property which during the term of the lease, the Coast Line was obliged to retain, repair, and renew. In our opinion neither position is tenable. It has been uniformly held that where property is leased for a long term of years and the lessee covenants to maintain, repair, and renew the property, the lessee is not entitled to an allowance for depreciation because it has invested no capital in the property. See Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L. Ed. 720; Belt Ry. Co. v. Lucas, Commissioner, 59 App.D.C. 137, 36 F.(2d) 541, certiorari denied, 281 U.S. 742, 50 S.Ct. 348, 74 L.Ed. 1155; Tunnel R. R. Co. v. Commissioner (C.C.A.) 61 F.(2d) 166, certiorari denied, 288 U.S. 604, 53 S.Ct. 396, 77 L.Ed. 979. In respect to the lessor under such a lease, the decisions are also unanimous to the effect that it is not entitled to an allowance for depreciation because it has sustained no loss, in view of the fact that the lessee has assumed an obligation to maintain, repair, and renew. Commissioner v. Terre Haute Elec. Co. (C.C.A.) 67 F.(2d) 697; Georgia Ry. & Electric Co. v. Commissioner (C.C.A.) 77 F.(2d) 897, certiorari denied October 14, 1935, 56 S.Ct. 117, 80 L.Ed. ——.

It is suggested by the taxpayers that in none of the cases in which these questions have been considered did the court have before it at the same time both the lessor and lessee railroad, and therefore did not meet the alternative propositions that the allowance for depreciation with respect to the property should be made either to one or the other. The contention that the allowance must be made to one or the other of the parties to such a lease was, however, considered and rejected in New York Central Railroad Co. v. Commissioner (C.C.A.) 79 F.(2d) 247, 250, certiorari denied (56 S.Ct. 370, 80 L.Ed. ——) December 23, 1935, in the following language: "The petitioner argues that either the lessor or the lessee of property should have a right to deduct a reasonable amount for exhaustion and depreciation, that under the facts at bar the lessor sustains no loss of capital, since he will receive equivalent property upon the termination of the lease, and that therefore the loss falls upon the lessee who has the burden of restoring the property's value. The Commissioner relies upon Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720, as did the Board, as establishing that the claimed deductions should not be allowed. There the taxpayer was engaged in the business of taking 99-year leases, renewable forever, and subletting. He claimed a deduction for depreciation of the buildings, which, it was assumed for purposes of the decision, he undertook to keep up to their present condition. In disallowing the deduction, Mr. Justice Holmes pointed out that the lessee had not yet made any capital investment, and concluded that 'it is not enough that he has made a contract that very possibly may not be carried out to replace that capital at some future time.' 279 U.S. 333, at page 336, 49 S.Ct. 337, 338, 73 L.Ed. 720. Despite possible verbal differences in the leases, we think Weiss v. Wiener is controlling and requires affirmance of the Board on this issue. In the case at bar the lessee made no capital investment in the leased property."

■ The facts with regard to the second question raised by the Coast Line relate to an agreement of February 23, 1926, between the Coast Line and a committee representing the bondholders of the Atlantic, Birmingham & Coast Railroad Company which was placed in receivership in 1915, and operated by the receiver up to and including the year 1926. During the taxable years involved, all of its stock was

owned by the Coast Line and its income tax returns were included in the consolidated returns filed by the latter. The agreement of February 23, 1926, provided that a new company should be organized to acquire the property of the company in receivership which should have a capitalization of $5,200,000 par value preferred stock entitled to 5 per cent. cumulative dividends, payable semiannually, and 150,000 shares of no par value common stock; that the preferred stock should have no power to vote except in case of a continuing default in the payment of two semiannual dividends, in which event the preferred stock should have exclusive voting power so long as the default continued; that the dividends of the preferred stock should be guaranteed by the Coast Line; that the Coast Line should provide cash for certain specified requirements in the total amount of approximately $3,600,000 and that the Coast Line should be entitled to receive the entire issue of common stock in exchange for the cash so provided. The agreement was performed and the stock of the company distributed as therein provided. During each of the years 1928, 1929, and 1930, the Coast Line, in compliance with its guaranty, paid the dividends on the preferred stock, including the sum of $257,059 to owners thereof other than the Coast Line itself. In its returns for these years, it claimed .the said sum as a deduction, but it was disallowed by the Commissioner.

The taxpayer contends that the obvious purpose of this agreement was to place it in a position to maintain and exercise continuous control of the properties of the A. B. & C. Railroad Company and to operate these properties as a part of its railroad system. It is pointed out that the taxpayer acquired nothing new or in addition to what it already had by the payments, and that each payment preserved for the six months' period the existing right to exclusive voting control over the affairs of the A. B. & C. Railroad and the management of its property. It is therefore contended that the payments were a regularly recurring expense necessary to preserve control over the physical operations of a part of the taxpayer's railroad system, and should be regarded either as an ordinary and necessary expense of the business or as a loss sustained in the course of its operation.

The argument is not without persuasive force, but we are of opinion that the payments made by the Coast Line under its guaranty were part of the consideration paid by it for the common stock and were therefore capital expenditures rather than losses or ordinary and necessary business expenditures. In Newark Milk & Cream Co. v. Commissioner (C.C.A.) 34 F.(2d) 854, a dispute between two sets of stockholders of a corporation was settled by an agreement whereby one set acquired the stock formerly held by the other; and as part of the agreement, the corporation guaranteed a return of 8 per cent. upon the consideration so paid for its stock for a period of ten years. It was held that the amounts paid under this guaranty by the corporation were not deductible from income as an ordinary and necessary business expense, but constituted part of the price paid by the stockholders who acquired the business in order to get control of the company.

The Coast Line contends that if a similar view is adopted in the present case, it will be impossible to determine the basic cost of the stock now or at any particular time in the future, and since the Coast Line would not be relieved from the obligation of its guaranty by a sale, the transaction could never be closed for tax purposes. This consideration, however, would not necessarily determine the character of the expenditures made under the guaranty, nor would any practical difficulty arise in the determination of the gain or loss by the taxpayer for purposes of taxation in case of a sale. If such a sale should take place, the cost of the stock would then be determined by reference to the cash outlay made under the agreement in 1926, including therein such amounts as would have been paid in the performance of the guaranty, and the profit or loss could be calculated accordingly. If additional payments under the guaranty should subsequently be required, they would be deductible as losses for the year in which they should occur.

The decisions of the Board of Tax Appeals are affirmed.

PARKER, Circuit Judge (concurring in part and dissenting in part).

I concur in the conclusion of the court on the first point discussed in its opinion, because of the decision of the Circuit Court of Appeals of the Second Circuit in New York Central Railroad Co. v. Commissioner, 79 F.(2d) 247, and because of the fact that certiorari has been denied (56 S.Ct. 370, 80 L.Ed. ——) by the Supreme Court in that case. While we are

admonished not to attribute weight to the denial of certiorari, I feel that the nature of the question involved was such that certiorari would have been granted if the decision of the Circuit Court of Appeals had not been approved. If I did not feel constrained by this circumstance, I would think that the opinion of the court pressed too far the doctrine laid down in Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L. Ed. 720.

With respect to the right to deduct depreciation, I can see no difference between the case of a railroad which owns its property and that of one which leases it under a 999-year lease with agreement to maintain, repair, and renew during the term of the lease. In either case the annual wear and tear on equipment is one of the expenses of operation and should be taken care of by an allowance for depreciation to the extent that it is not covered by the charging of items to expense in preserving the normal level of maintenance.[1] It is true, theoretically, that the property upon which depreciation is allowed in the latter case is not the property of the taxpayer, but to all intents and purposes it is his property, he must replace it when it is worn out, and its depreciation during the year has been incurred in earning the income upon which he is taxed.

In United States v. Ludey, 274 U.S. 295, 301, 47 S.Ct. 608, 610, 71 L.Ed. 1054, the Supreme Court says: "The theory underlying this allowance for depreciation is that by using up the plant a gradual sale is made of it. The depreciation charged is the measure of the cost of the part which has been sold." This gradual sale of railroad equipment through operation is made whether it be owned or leased; and if there is an agreement on the part of the lessee to repair and replace, the depreciation of material represents a partial sale of equipment and a liability incurred therefor during the year for which the lessee should be permitted to take deduction, where, as here, it is certain that the liability will eventually be met and discharged by him. The situation is not unlike that applying in the case of bond discount, the amortization of which is permitted although it is not in reality paid until the bonds mature. Helvering v. Union Pac. R. Co., 293 U.S. 282, 287, 55 S.Ct. 165, 79 L.Ed. 363.

In Gambrinus Brewery Co. v. Anderson, 282 U.S. 638, 643-645, 51 S.Ct. 260, 261, 75 L.Ed. 588, it was said: "The cost of plant depreciation, i. e., exhaustion, wear, tear, and obsolescence, is a part of operating expenses necessary to carry on a manufacturing business. The gain or loss in any year cannot be rightly ascertained without taking into account the amount of such cost that is justly attributable to that period of time. * * * The statute contemplates annual allowance for obsolescence just as it does for exhaustion, wear, and tear. That is necessary in order to determine true gain or loss because postponement of deductions to cover obsolescence until the property involved became obsolete would distort annual income." And in Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 654, 51 S.Ct. 262, 264, 75 L.Ed. 594, the court emphasized the importance of applying the provision of the statute for the benefit of all taxpayers, saying: "Clearly the statute contemplates that, where warranted by the facts, the taxpayer shall have the benefit of, and in making his return may deduct in each year, a reasonable allowance to cover obsolescence of the tangible property. And that is in accord with sound principles of accounting. Cf. Kansas City So. Ry. v. United States, 231 U.S. 423, 451, 34 S.Ct. 125, 58 L.Ed. 296, 52 L.R.A.(N.S.) 1; Pacific Gas & Electric Co. v. San Francisco, 265 U.S. 403, 415, 44 S.Ct. 537, 68 L.Ed. 1075. The provision is general, and applied alike to all taxpayers; its purpose is to guide the ascertainment of taxable income in each year. It is a familiar rule that tax laws are to be liberally construed in favor of taxpayers." I see no reason why a railroad company which practically owns a leased system, and which is bound under its contract to make good depreciation sustained, should not have a reasonable deduction for such depreciation annually instead of having its income distorted by being allowed an undue amount for replacements for the years in which they are made.

The Interstate Commerce Commission allows such depreciation in computing income for rate making purposes; and, not to allow it when computing income for purposes of taxation, seems to me to ignore the actualities of the situation. When an item of the leased equipment is worn out, the Coast Line will be compelled to

---

[1] As to charging to expense in railroad accounting repair and replacement items necessary to preserve the normal level of maintenance, see Sou. Ry. Co. v. Com'r (C.C.A.4th) 74 F.(2d) 887, 890.

replace it in the same way that it replaces equipment which it owns; and, to permit a deduction of annual depreciation in the latter case and deny it in the former does not impress me as reasonable or as in accord with the principles under which depreciation is allowed. While the taxpayer does not own the title to the property leased as a matter of technical law, it is the owner of such property for all practical purposes and should be allowed depreciation on its "economic interest" therein, in accordance with the same principle on which depletion was allowed in Lynch v. Alworth-Stephens Co., 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660, and Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L. Ed. 489.

For the foregoing reasons, I would be of opinion that the Board of Tax Appeals should be reversed in No. 3895 but for the decision of the Second Circuit in the New York Central Case and the refusal of certiorari by the Supreme Court (56 S.Ct. 370, 80 L.Ed. ——).

There is in my mind no doubt as to the correctness of the court's decision in the matter of the Carolina, Clinchfield & Ohio, No. 3896.

On the second point in No. 3895, i. e., whether the expenditures made by the Atlantic Coast Line to make good its guaranty of dividends to the holders of the preferred stock of the A. B. & C. Railroad are deductible as expenses of operation, I must dissent from the conclusion of the majority. The guaranty of dividends was not given by taxpayer as a means of acquiring the common stock of the A. B. & C. as a capital investment, but the common stock was acquired at the price approved by the Interstate Commerce Commission and the guaranty of dividends on preferred stock was given in order that taxpayer might gain control of the railroad's properties and operate them as a part of its system. If it failed to make good its guaranty of dividends on preferred stock, it would lose the control which it had acquired; but, irrespective of this, any payment made under the guaranty was made under an obligation assumed for the purpose of operating the railroad as a part of its system. I see no reason why expenditures made in accordance with such obligation should not be considered in law, what they are in fact, expenses of operation. They add nothing to the value of the property or to the value of the common stock held by the taxpayer. If they had been made in paying interest on the bonds for which the preferred stock was exchanged, no one would contend that they were not proper deductions from income, yet they diminish the real income of the taxpayer just as truly as if they were made for such purpose.

A case very much in point is New York, etc., R. Co. v. Helvering, 63 App. D.C. 247, 71 F.(2d) 956. In that case the Lake Erie & Western Railroad Company had leased properties of the Northern Ohio Railway Company, in perpetuity, acquiring all of the common stock of that company as a part of the same transaction. It agreed to pay as rental the net earnings of the company, and in the event these were not sufficient therefor, certain other expenses including interest on the Northern Ohio's bonds. The out of pocket cost to the Lake Erie under this agreement was approximately three and three-quarter million dollars, and it was argued that this amount should be treated as capital expenditure and as a part of the cost of acquisition of the stock and lease, but the court held otherwise. Certainly if interest on bonds which one agrees to pay at the time of the acquisition of stock may not be considered as a part of the cost of the stock, there is no reason for so considering amounts paid under a guaranty of dividends made under similar circumstances.

It is a mistake, in my opinion, to consider the payments made as arising out of the contract under which the common stock was purchased. While provided for by that contract, they in fact arise out of losses incurred in the operation of taxpayer's railroad system. If in the operation of that system sufficient revenue accrues to the A. B. & C. Railroad to pay the dividends on its preferred stock, the dividends are paid from such revenue; but if the revenue of the A. B. & C. is not sufficient to pay these dividends, they must be paid by the taxpayer from its other revenues, and there can be no question about the fact that its net income is decreased accordingly, without anything being added to its invested capital. To deny it a deduction of the amounts paid under such circumstances on the ground that the amount paid in dividends is a capital investment, is to sacrifice fact to theory, and to be legalistic in a matter as to which we are admonished to be practical.